**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NIKE USA, INC.,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 18-5460-KSM** |
| **OFFICIAL UNLIMITED INC., et al.,** | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                                             **April 21, 2022**

Presently before the Court is Plaintiff Nike USA, Inc.'s motion for default judgment in a breach of contract case, where Defendant Official Unlimited allegedly never rendered payment for the sporting goods that Plaintiff sold and delivered to it and Defendant Jonathan Nadav[1] never paid Official Unlimited's debts despite having signed a Personal Guaranty in which he agreed to do so.  For the reasons discussed below, we grant Plaintiff's motion for default judgment.

## I.      Factual Background

From 2016 to 2018, Plaintiff sold sporting goods, shoes, and apparel to Official Unlimited.[2]  (Doc. No. 41 at ¶¶ 20, 38.)

---

[1] Jonathan Nadav is also known as Yoni Nadav.  (*See* Doc. No. 41 at 1; *see also* Doc. No. 1, Ex. A at 14 (signature of Mr. Nadav on the Account Agreement with Nike).)

[2] In deciding this motion for default judgment, we accept as true the factual allegations (other than those as to damages) contained in the complaint.  *See Serv. Emps. Int'l Union Local 32BJ Dist. 36 v. ShamrockClean Inc.*, 325 F. Supp. 3d 631, 635 (E.D. Pa. 2018).

### A.  The Account Agreement

On September 20, 2016, Defendant Jonathan Nadav, President[3] of Official Unlimited, signed the Nike USA, Inc. Account Agreement (the "Account Agreement"), on behalf of Official Unlimited.  (Doc. No. 41 at ¶ 21; Doc. No. 1, Ex. A at 12–14.)  The Account Agreement provides, "Customer will pay for all Product by the date specified on NIKE's invoice, or if none is specified, within 30 days after the date of that invoice.  Any sum not paid when due is subject to a service charge of 1.5% per month or the maximum rate permitted by law, whichever is lower."  (Doc. No. 1, Ex. A to Ex. A at 15 ¶ 3; Doc. No. 41 at ¶ 23.)  Under the Account Agreement, Official Unlimited was required to dispute any invoice in writing "within 30 days after the date that invoice is due"; if it did not dispute the invoice, the amount reflected in the invoice was deemed to be accepted.  (Doc. No. 1, Ex. A to Ex. A at 15 ¶ 3; Doc. No. 41 at ¶ 24.)  The Account Agreement also provides that Official Limited "will pay all costs, collection agency fees, expenses, reasonable attorney fees (whether incurred prior to, at trial or on appeal) incurred by NIKE in connection with the collection of any past due sums."  (Doc. No. 1, Ex. A to Ex. A at 18 ¶ 16; Doc. No. 41 at ¶ 36.)

The Account Agreement enabled Official Unlimited to display and sell Nike goods at its retail location.  (Doc. No. 41 at ¶ 22; Doc. No. 1, Ex. A at 12 ¶ 2.)  However, the Account Agreement required Official Unlimited to submit to Nike a new account application if it opened or acquired additional retail outlets and prohibited Official Unlimited from selling Nike product at any new locations until Nike approved the new account application.  (Doc. No. 41 at ¶¶ 25–27; Doc. No. 1, Ex. A at 13 ¶ 8 ("CUSTOMER IS NOT AUTHORIZED TO SELL PRODUCT

---

[3] Mr. Nadav was the majority owner of Official Unlimited until the end of the 2017.  (*See* Doc. No. 41 at ¶ 3 (alleging that Mr. Nadav "was at least fifty percent (50%) owner of Official Unlimited Inc until the end of 2017).)

AT ANY RETAIL OUTLET . . . OTHER THAN THAT OR THOSE IDENTIFIED ON . . .

EXHIBIT B.  CUSTOMER MUST SUBMIT A SEPARATE APPLICATION FOR EACH

ADDITIONAL STORE . . . AND EACH APPLICATION MUST BE APPROVED BY NIKE IN

WRITING BEFORE IT BECOMES EFFECTIVE.").)  The only approved retail location at

which Official Unlimited could sell Nike apparel was its storefront at 2331 N. Broad Street in

Philadelphia, Pennsylvania.  (Doc. No. 41 at ¶¶ 11, 28.)

The Account Agreement also prohibited Official Unlimited from selling Nike products

online without Nike's approval.  (*Id.* at ¶¶ 29–31; Doc. No. 1 at 13 ¶ 8 ("APPROVAL OF NIKE

OF AN APPLICATION FOR A STORE DOES NOT MEAN THAT THE CUSTOMER IS

AUTHORIZED TO SELL PRODUCT BY CATALOGUE, OR THROUGH A WEBSITE OR

OTHER ELECTRONIC MEANS."); *id.* (check box indicating that Official Unlimited was not

approved for digital sales from websites and/or mobile application).)

Furthermore, the Account Agreement prohibited Official Unlimited from selling Nike

products to non-retail customers.  (Doc. No. 41 at ¶¶ 32–34; Doc. No. 1, Ex. A at 13 ¶ 8 (check

box indicating that Official Unlimited was not approved for a non-retail account); Doc. No. 1,

Ex. A to Ex. A at 15 ¶ 6.A.(b) ("Customer will not . . . sell Product other than to retail consumers

physically present at such Store who are purchasing for their personal use and not for resale.").)

### B.  *The Personal Guaranty*

In connection with the opening of Official Unlimited's account with Nike, Mr. Nadav

signed a Personal Guaranty in which he personally guaranteed to pay Official Unlimited's debts.[4]

---

[4] Although Mr. Nadav identified himself as the "Customer" instead of Official Unlimited, this was erroneous; the intent of the Personal Guaranty is that Official Unlimited was the "Customer" (as it says "[insert retailer name]" next to the "Customer" line) and Mr. Nadav was the "Guarantor."  (*Id.* at ¶ 43; *see also* Doc. No. 1, Ex. B at 20 ("To induce NIKE to extend credit to [insert retailer's name] JONATHAN NADAV ('Customer') or to temporarily forbear from diminishing credit to Customer, the undersigned individual (referred to jointly and severally as 'Guarantor') unconditionally, absolutely and irrevocably

3

(*See* Doc. No. 41 at ¶¶ 39–53.)  Specifically, Mr. Nadav "unconditionally, absolutely and irrevocably guarantee[d] and promise[d] to pay to NIKE when due all indebtedness owing from [Official Unlimited] to NIKE."  (Doc. No. 1, Ex. B at 20; Doc. No. 41 at ¶ 44.)  "Indebtedness" is defined as "includ[ing] all debts, obligations and liabilities of every nature owed by [Official Unlimited] to NIKE USA, Inc. and/or any of its affiliates . . . including principal, interest, charges, attorney fees, and costs."  (Doc. No. 1, Ex. B at 20; Doc. No. 41 at ¶ 45.)

The Personal Guaranty also provides that "NIKE will be entitled to collect from Guarantor all of NIKE's costs, collection agency fees, expenses, attorney fees and fees of corporate counsel incurred in connection with collection efforts (including, without limitation, at trial and on appeal)."  (Doc. No. 1, Ex. B at 21 ¶ 8; Doc. No. 41 at ¶ 48.)

The Personal Guaranty was never terminated.  (Doc. No. 41 at ¶ 53; *see also* Doc. No. 1, Ex. B at 20 ¶ 7 ("This Guaranty will remain in effect until Guarantor gives NIKE written notice by certified mail of Guarantor's termination of this Guaranty.").)

### C.  Nike's Allocation of Product and Defendants' Conduct

As a general matter, Nike allocates high-demand product to its retailers based on market conditions and demand.  (Doc. No. 41 at ¶ 54.)  "Nike monitors the supply and demand of its new and most demanded products so that each market is properly supplied with sufficient product to reasonably meet customer expectations."  (*Id.* at ¶ 55.)  Accordingly, if Nike's retailers order quantities in excess of what they can sell to consumers, that detrimentally affects other Nike retailers and consumers and upends the balance of supply and demand.  (*Id.* at ¶¶ 56–57.)  Just as it relies on its retailers to order the correct amount of goods, Nike relies on its

---

guarantees and promises to pay to NIKE when due all indebtedness owing from Customer to NIKE and to perform all of Customer's other obligations to NIKE.").)

retailers to adhere to the specified release dates for certain products.  (*Id.* at ¶ 58.)  If a brick-and-mortar retailer releases a product early or late, the market is left "improperly serviced" and the supply of Nike product may be artificially impacted.  (*Id.* at ¶ 59.)

Here, Nike shipped its product to Official Unlimited's Office and Warehouse, 86 Tomlinson Road #E, Huntingdon Valley, Pennsylvania 19006.  (*Id.* at ¶ 61.)  The product was to be sold by Official Unlimited to its retail customers at its retail location on North Broad Street and was obtained from Nike through the Account Agreement.  (*Id.* at ¶¶ 65, 76.)  Nike alleges that Official Unlimited, through Nadav, "intentionally interfered with Nike's careful efforts to adequately supply its retailers and customers with sufficient quantities of goods to meet demand" by over-ordering Nike product to resell through unapproved third parties and by selling Nike product prior to the set release dates.  (*Id.* at ¶¶ 66–67.)

Official Unlimited sold Nike product to resellers out of the back door of its North Broad Street location and its warehouse.  (*Id.* at ¶¶ 68–69, 72; *see also id.* at ¶ 75 ("Unauthorized retailers . . . would pick up Nike goods in a van or truck from the Official Unlimited Office and Warehouse, for the purpose of reselling the Nike Products.").)  "Official Unlimited employees who sold the Nike Product out of the back door of the Official Unlimited Office and Warehouse to unauthorized retailers were allowed to keep some or all [of] the proceeds, sometimes in lieu of their salary."  (*Id.* at ¶ 74.)

Motag LLC, a company that Nadav also co-owned, is an unauthorized third-party reseller to whom Official Unlimited sold or transferred Nike product.  (*See id.* at ¶¶ 79–80, 82, 84–86, 88, 90–91; *see also id.* at ¶ 87 ("Official Unlimited, Nadav, and/or Argaman established an unlawful distribution scheme by utilizing Motag LLC as a sham entity who would purchase, obtain, or otherwise acquire the Nike Product from Official Unlimited to resell or distribute to

unauthorized retailers or distributors.").

Official Unlimited also failed to pay its invoices and is indebted to Nike "in an amount no less than $758,701.98, exclusive of interest, fees and costs." (*Id.* at ¶ 94; *see also* Doc. No. 1, Ex. C at 22–23 (account statement, showing a total amount owed of $758,701.98).)

## II.   Procedural History

On December 19, 2018, Plaintiff filed a complaint in this Court against Official Unlimited and Mr. Nadav. (Doc. No. 1.) The Complaint set forth five causes of action: a debt action against Official Unlimited (Count I), breach of contract claims against Official Unlimited (Counts II & III), a claim based on the personal guaranty against Mr. Nadav (Count IV), and a claim for indemnification against Mr. Nadav (Count V). (*Id.*) On January 16, 2019, the process server served the summons and complaint upon Mr. Nadav. (Doc. Nos. 3–4.)

On March 19, 2019, counsel appeared on behalf of Official Unlimited and Mr. Nadav (Doc. No. 12), and the following month, on April 4, Official Unlimited and Mr. Nadav filed a motion to dismiss the complaint (Doc. No. 14). On May 16, the Court denied the motion to dismiss and ordered Official Unlimited and Mr. Nadav to answer the complaint. (Doc. No. 16.) On May 30, Defendants answered the complaint. (Doc. No. 19.)

However, a few months later, on July 26, counsel for Official Unlimited and Mr. Nadav filed a motion to withdraw. (Doc. No. 26.) On July 30, the Court granted the motion to withdraw and ordered Official Unlimited to obtain counsel. (*See* Doc. No. 27 at 1 ("Defendant Official Unlimited, Inc. shall be prepared to proceed with counsel in this matter on August 30, 2019. Defendant Official Unlimited, Inc. is a corporation, and, according to long-established Third Circuit precedent, cannot proceed as a *pro se* litigant in federal court, and cannot be represented by Defendant Nadav, a non-attorney.").) When Official Unlimited did not retain

new counsel, in violation of the Court's July 30 Order, Plaintiff filed a motion for contempt.
(Doc. No. 28.)  The Court denied the motion for contempt, but stated that because Official
Unlimited "ha[d] not complied with this Court's July 30, 2019 Order to obtain new counsel . . .
Plaintiff may file a request with the Clerk of Court for entry of default in accordance with
Federal Rule of Civil Procedure 55(a), if appropriate.  In any event, this matter shall proceed
against Defendant Jonathan Nadav, *pro se*."  (Doc. No. 29.)

On February 27, 2020, this matter was reassigned from the Honorable Nitza I. Quiñones-
Alejandro to the Honorable Karen Spencer Marston.  (Doc. No. 36.)  A month later, on March
26, Plaintiff filed a Motion to Amend its Complaint, seeking to add Motag LLC and Shai
Argaman[5] as Defendants (the "Additional Defendants") and to assert additional claims.  (Doc.
No. 38.)  The Court granted the motion.  (Doc. No. 40.)  The Amended Complaint asserts nine
causes of action:  a debt action against Official Unlimited (Count I), breach of contract claims
against Official Unlimited (Counts II and III), a tortious interference with contract claim against
Mr. Nadav and Additional Defendants (Count IV), a fraud claim against Mr. Nadav and
Additional Defendant Argaman (Count V (mislabeled Count IV)), an aiding and abetting fraud
claim against Mr. Nadav and Additional Defendant Argaman (Count VI (mislabeled Count IV)),
a tortious interference with business relations claim against Mr. Nadav and Additional
Defendants (Count VII (mislabeled V)), a claim against Mr. Nadav arising out of the personal
guaranty (Count VIII (mislabeled Count VI)), and a claim for indemnification against Mr. Nadav
(Count IX (mislabeled Count VII)).  (Doc. No. 41.)  Official Unlimited and Mr. Nadav never
answered or responded to the Amended Complaint.

On April 1, 2020, the Court ordered Official Unlimited to "show good cause why default

---

[5] Argaman was also an officer of Official Unlimited and was a partial owner of Official Unlimited until
December 31, 2017.  (Doc. No. 41 at ¶¶ 5–6.)

should not be entered against it." (Doc. No. 43.)  Official Unlimited never responded.

Magistrate Judge Marilyn Heffley held a number of settlement conferences between Plaintiff and Additional Defendants from June 2020 to March 2021.  After reaching a settlement, Plaintiff and the Additional Defendants filed a Stipulation of Dismissal, the Court entered an order pursuant to Local Civil Rule 41.1b, and the Additional Defendants were dismissed.  (Doc. Nos. 64–65.)  Mr. Nadav, however, did not participate in the settlement.  (*See* Doc. No. 71.)[6]

Default has been entered against Mr. Nadav and/or Official Unlimited, and Plaintiff has moved for entry of default judgment, seeking the contract amount (minus the voluntary resolution Plaintiff received from another potentially responsible party).  (Doc. No. 71.)  The Court scheduled a hearing on the motion for April 20, 2022, ordered Plaintiff to file a supplemental memorandum and affidavit, and directed Plaintiff to serve Defendants with copies of the Order, Plaintiff's motion for default judgment, and Plaintiff's memorandum and affidavit. (Doc. No. 72.)  Plaintiff represents that it does not intend to seek attorneys' fees, costs, or interest.  (Doc. No. 73; *see also* Hr'g Tr.)  Mr. Nadav attended the April 20 hearing and did not oppose the motion.  (*See* Hr'g Tr.)

### III.    Legal Standard

Under Federal Rule of Civil Procedure 55, a district court may enter default judgment against a party who has failed to defend an action.  Fed. R. Civ. P. 55; *see also Plumbers Union Local No. 690 v. F.P.S. Plumbing, Inc.*, Civil Action No. 08-4271, 2009 WL 2591153, at *2 (E.D. Pa. Aug. 20, 2009).  "Entry of default judgment under Rule 55 is not limited to situations where a party fails to respond to a complaint, but also includes situations where a party fails to

---

[6] Following the settlement between Plaintiff and Additional Defendants, this Court held telephonic conferences with Plaintiff and Mr. Nadav on June 6, 2021 and September 17, 2021.  (Doc. Nos. 66, 67.)

comply with the court's orders." *Plumbers Union Local No. 690*, 2009 WL 2591153, at *2

(citing *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 918 (3d Cir. 1992)); *see also*

*Williams-Lester v. Vision Fin. Corp.*, Civil Action No. 15-6662, 2017 WL 457184, at *2 (E.D.

Pa. Feb. 1, 2017) ("Failure to 'otherwise' defend includes failure to comply with a Court order to

'obtain substitute counsel.'" (quoting *Hoxworth*, 98 F.2d at 918)).

When the plaintiff has filed a motion for default judgment against a defendant who filed

an answer or other responsive pleading but then failed to properly participate in the litigation,

default judgment functions as a sanction. *Williams-Lester*, 2017 WL 457184, at *2.  In this

situation, the Court must consider the six factors outlined by the Third Circuit in *Poulis v. State*

*Farm Fire and Casualty Co.*, 747 F.2d 863 (3d Cir. 1984):

> (1) the extent of the party's personal responsibility; (2) the prejudice to
> the adversary caused by the failure to meet scheduling orders and
> respond to discovery; (3) a history of dilatoriness; (4) whether the
> conduct of the party or the attorney was willful or in bad faith; (5) the
> effectiveness of sanctions other than dismissal, which entails an analysis
> of alternative sanctions; and (6) the meritoriousness of the claim or
> defense.

*Id.* at 868; *see also Jimenez v. Rosenbaum-Cunningham, Inc.*, Civil Action No. 07-1066, 2010

WL 1303449, at *3 (E.D. Pa. Mar. 31, 2010) ("A default judgment in these circumstances

effectively functions as a sanction, and the application of the *Poulis* factors affords a defendant

certain protections before his right to . . . defend against a claim is denied" (cleaned up)); *Malibu*

*Media, LLC v. Paek*, Civil Action No. 13-2766, 2015 WL 779494, at *2 (E.D. Pa. Feb. 23, 2015)

("These so-called *Poulis* factors govern the entry of default judgment as a sanction under . . .

Rule 55(b)."); *Plumbers Union Local No. 690*, 2009 WL 2591153, at *2 (same).

"No single *Poulis* factor is dispositive," *Briscoe v. Klaus*, 538 F.3d 252, 263 (3d Cir.

2008), and "not all of the factors need to weigh in favor of entering default judgment against a

defendant," *Plumbers Union Local No. 690*, 2009 WL 2591153, at *2; *see also Philly*

*Opportunity Fund, LLC v. Barach*, Civil Action No. 20-3462, 2021 WL 5863590, at *1 n.1 (E.D. Pa. July 1, 2021) ("No single factor is dispositive, nor do all need to be satisfied."); *Jimenez*, 2010 WL 1303449, at *3 ("A court may have insufficient information to evaluate all the *Poulis* factors, but that will not prevent the entry of a default judgment that is otherwise appropriate, since all *Poulis* factors need not favor the entry of default judgment.").

However, before turning to the *Poulis* factors, the Court first ascertains whether the Amended Complaint establishes a legitimate cause of action. *See Williams-Lester*, 2017 WL 457184, at *2; *Jimenez*, 2010 WL 1303449, at *4.

## IV.    Discussion

### A.    *Plaintiff Has Stated Claims Against Official Unlimited and Mr. Nadav*

First, the Court finds that Plaintiff has stated a claim for breach of contract against Official Unlimited based on Official Unlimited's failure to pay Plaintiff for the Nike products that Plaintiff delivered to it (Count II).  Pursuant to the forum selection clause in the Account Agreement, Oregon law governs the breach of contract claim.  (*See* Doc. No. 1, Ex. A to Ex. A at 18 ¶ 16 ("The Agreement, and all disputes arising out of the Agreement or out of the relationship between NIKE and Customer, will be governed by the laws of the State of Oregon.").)  To state a claim for breach of contract under Oregon law, a plaintiff must allege:  (1) the existence of a contract, (2) the relevant terms of the contract, (3) that the plaintiff substantially performed its obligations under the contract, and (4) the defendant's breach resulted in damages to the plaintiff. *See Equipment Fin. Partners v. Rose*, No. 3:13-cv-00734-MO, 2014 WL 1917957, at *4 (D. Or. May 12, 2014); *Olmstead v. ReconTrust Co., N.A.*, 852 Supp. 2d 1318, 1322 (D. Or. 2012) (citing *Slover v. Or. State Bd. of Clinical Social Workers*, 927 P.2d 1098, 1101–02 (Or. Ct. App. 1996)).

Here, Plaintiff submitted a copy of the Account Agreement (Doc. No. 1, Ex. A at 12–14), the Terms and Conditions of Sale of the Account Agreement (*id.* at 15–18, Ex. A to Ex. A), and an account statement (*id.* at 22). Together, these show that Plaintiff and Official Unlimited entered into a contract and Official Unlimited received $758,701.98 in Nike products pursuant to this contract. The Account Agreement was signed by Mr. Nadav on behalf of Official Unlimited. (*Id.* at 14.) According to the Account Agreement, payment was due within 30 days after the date of the invoice (*id.* at 15), and the date of the first invoice appears to be August 24, 2017 (*see id.* at 22). Official Unlimited is in breach of the agreement because to date, it has not paid $758,701.98 for the products delivered to it. (*Id.* at 22–27.) And because Plaintiff delivered the products and did not receive payment, it has suffered damages from Defendant's breach, the loss of $758,701.98. Because Plaintiff delivered the Nike products to Official Unlimited, it substantially performed its obligations under the contract. (*See* Doc. No. 41 at ¶ 99 ("Nike provided goods and services provided to Official Unlimited Inc., which was Nike's substantial performance pursuant to the Account Agreement.").)

In addition, Plaintiff has stated a claim for breach of the personal guaranty against Mr. Nadav. As with the Account Agreement, the Personal Guaranty has a choice of law provision; thus, Oregon law governs this claim as well. (*See* Doc. No. 1, Ex. B at 21 ¶ 9 ("Guarantor also agrees that the laws of Oregon . . . will apply.").) "A claim for breach of guaranties is treated like any other breach of contract." *Equipment Fin. Partners v. Rose*, No. 3:13-cv-00734-MO, 2014 WL 1917957, at *4 (D. Or. May 12, 2014) (citing *White Stag Mfg. Co. v. Wind Surfing, Inc.*, 679 P.2d 312, 216 n.8 (Or. Ct. App. 1984)). As noted above, to state a claim for breach of contract, the plaintiff must allege: (1) the existence of a contract, (2) the relevant terms of the contract, (3) that the plaintiff substantially performed its obligations under the contract, and

(4) the defendant's breach resulted in damages to the plaintiff.  *See Equipment Fin. Partners*,

2014 WL 1917957, at *4; *Olmstead*, 852 Supp. 2d at 1322.  Plaintiff submitted a copy of the

Personal Guaranty, which is signed by Mr. Nadav.  (Doc. No. 1 at 20–21.)  According to the

Personal Guaranty, "[t]o induce NIKE to extend credit to" Customer (i.e., Official Unlimited),[7]

Mr. Nadav "irrevocably guarantee[d] and promise[d] to pay to NIKE when due all indebtedness

owing from Customer to NIKE and to perform all of Customer's other obligations to NIKE."

(*Id.* at 20.)   The Personal Guaranty also states, "Guarantor agrees to indemnify NIKE . . . against

all losses incurred or paid by NIKE in any way arising out of or in connection with NIKE's

transactions with Customer."  (*Id.*)  At bottom, Mr. Nadav agreed to guarantee Official

Unlimited's debts.  Mr. Nadav is in breach of the Personal Guaranty because he has not paid the

$758,701.98 that Official Unlimited owes Plaintiff.  Because Plaintiff extended credit to Official

Unlimited, it substantially performed its part of the agreement.  And because Mr. Nadav has not

paid Official Unlimited's debts, Plaintiff has been damaged, having lost $758,701.98.[8]

### B.  The Poulis Factors Weigh in Favor of Granting Default Judgment

Having found that Plaintiff states legitimate causes of action against Mr. Nadav and

Official Unlimited, the Court now considers whether the *Poulis* factors indicate that default

---

[7] As noted above, although Mr. Nadav printed his name next to the line that identifies the Customer, it is apparent that Official Unlimited is the Customer, as evidenced by the fact that the Personal Guaranty states "insert retailer's name" next to the line Mr. Nadav printed his own name on, which defines "Customer."  Further, as a matter of common sense, Mr. Nadav would not be his own Guarantor.

[8] Plaintiff only seeks the amount owed under the Account Agreement and Personal Guaranty.  (*See* Doc. No. 71.)  As such, the Court does not consider whether Plaintiff has also stated the additional claims against Official Unlimited and Mr. Nadav (alleging that Official Unlimited breached the Account Agreement by engaging in transshipping; and alleging that Mr. Nadav tortiously interfered with the contract, committed fraud and aided and abetted the fraud, and tortiously interfered with business relations).

judgment is appropriate.

### 1. Extent of the Parties' Personal Responsibility

The first factor requires us to consider the extent of the parties' personal responsibility. Mr. Nadav was originally represented by counsel, who later withdrew.  Thus, Mr. Nadav is proceeding *pro se* and is responsible for his failure to participate in this litigation.  *See Malibu Media, LLC*, 2015 WL 779494, at *2 ("Because Defendant is proceeding *pro se*, he alone is responsible for his failure to comply with this Court's orders.  His failures to comply with Plaintiff's discovery requests and this Court's orders cannot be attributed to this counsel or any other party."); *Jimenez*, 2010 WL 130449, at *6 (holding that the first factor weighed in favor of default judgment even though the defendant did not have counsel because "his *pro se* status [does not] excuse his failure to participate in the litigation" and he failed to present "any excuse for his non-participation in the litigation and his disregard of [the court's] Orders").

Official Unlimited was also initially represented by counsel, who later withdrew. "[B]ecause a corporation cannot represent itself in federal court, [Official Unlimited] bears substantial personal responsibility to follow the Court's orders and appoint new counsel." *Williams-Lester*, 2017 WL 457184, at *5.

Accordingly, the first factor weighs in favor of the entry of default judgment as to Mr. Nadav and Official Unlimited.

### 2. Prejudice to the Adversary

Next, the Court considers the prejudice that Defendants' actions caused Plaintiff.  First, the Court finds that Mr. Nadav's failure to participate in this litigation resulted in prejudice to Plaintiff.  Mr. Nadav did not answer or otherwise respond to the Amended Complaint.  Nor did Mr. Nadav respond to requests for document production or to requests to supplement discovery,

and he did not participate meaningfully in mandated mediation.  (*See* Doc. No. 71 at 11, 13; *see also* id. at 6–7 ("Plaintiff and Additional Defendants attended and participated in the Settlement Conference, with Defendant Nadav indicating that he did not wish to participate in settlement discussions."); Doc. No. 39 at 2 ("[B]oth of the Defendants, Official Unlimited and Nadav, who is pro se, have completely failed to respond or object to Nike's First Request for Production of Documents."); Doc. No. 47 at 1 n.1 ("Any individual-party who is proceeding pro se shall participate in the settlement conference on their own behalf.").)

Likewise, Official Unlimited's actions have prejudiced Plaintiff, as it has also failed to participate in this litigation.  Official Unlimited failed to comply with this Court's July 30, 2019 Order directing it to obtain counsel and this Court's April 21, 2020 Order directing it to show good cause as to why default should not be entered.  *See Williams-Lester*, 2017 WL 457184, at *5 ("VFC's failure to comply with the Court's Orders deprived Williams-Lester of the opportunity to conduct discovery, develop the factual record, and reach a speedy and fair resolution to the litigation, resulting in significant prejudice to her." (cleaned up)).

Thus, the second factor also weighs in favor of entry of default judgment as to Mr. Nadav and Official Unlimited.

### 3.  <u>History of Dilatoriness</u>

Turning to the third factor, Mr. Nadav has engaged in dilatory conduct.  For two years, Mr. Nadav has failed to participate in this case.  Likewise, for nearly three years, Official Unlimited has failed to comply with this Court's Order to obtain new counsel.  And Official Unlimited failed to respond to the Order from two years ago directing it to show cause why default should not be entered against it.  Both Defendants' conduct reflects dilatoriness.  *See, e.g.*, *id.* ("VFC displayed serious dilatoriness by ignoring two Court Orders and not participating

Case 2:18-cv-05460-KSM   Document 77   Filed 04/21/22   Page 15 of 18

in this litigation in over ten months."); *Malibu Media, LLC*, 2015 WL 779494, at *3 ("Following the withdrawal of his counsel, Defendant has not undertaken any efforts to defend this matter. Defendant's dilatoriness is evidenced by . . . his failure to respond to the Rule to Show Cause Order of January 6, 2015, directing him to show cause why default judgment should not be entered against him.").

Accordingly, the third factor weighs in favor of default judgment as to both Defendants.

### 4. <u>Willful or Bad Faith Conduct</u>

The fourth factor requires the Court to consider whether Defendants' conduct evidences willfulness or bad faith. The Court will not presume to know the reasons for Mr. Nadav's and Official Unlimited's failure to participate in this matter and notes that during the April 20 hearing, Defendant acknowledged Mr. Nadav's honesty during this process. However, as courts in this Circuit have recognized, "the 'absence of reasonable excuses may suggest that the conduct was willful or in bad faith.'" *Jimenez*, 2010 WL 1303449, at *7 (quoting *Roman v. City of Reading*, 121 F. App'x 955, 960 (3d Cir. 2005)); *see also Malibu Media, LLC*, 2015 WL 779494, at *3. Mr. Nadav's failure to respond to Plaintiff's discovery requests bears on this factor. *See Jimenez*, 2010 WL 1303449, at *7 ("Cunningham's disregard of Plaintiffs' discovery requests, unexplained non-compliance with our Order of June 29, 2009, and failure to respond to D & B's cross-claims were not isolated acts but part of a continuing pattern. Cunningham's conduct suggests that his failure to participate in the litigation is willful."). Likewise, Official Unlimited's failure to comply with this Court's orders—directing it to obtain counsel and then directing it to show cause—compels a finding of willfulness. *See Philly Opportunity Fund, LLC*, 2021 WL 5863590, at *1 n.1 ("Barach ignored the Court's Order and has made no effort to explain or excuse his conduct. Barach's unexplained disregard for the Court's Order is evidence

of willfulness and weighs in favor of entry of default."); *Malibu Media, LLC*, 2015 WL 779494, at *3 ("Defendant's repeated failure to comply with this Court's orders and, in particular, his failure to respond to this Court's Rule to Show Cause Order evidences willfulness."); *Plumbers Union Local No. 690*, 2009 WL 2591153, at *3 ("[T]he unexplained disregard for this Court's unambiguous orders is at the very least convincing evidence of willfulness.").

Therefore, the fourth factor weighs in favor of entry of default judgment.

### 5.  <u>Effectiveness of Other Sanctions</u>

Fifth, given the lengthy history at play here (i.e., Defendants' continued, unexplained refusal to participate in this litigation for years, including, *inter alia*, their failure to respond to the Amended Complaint or certain requests for discovery), the Court concludes that alternative sanctions are unlikely to be effective. *See Williams-Lester*, 2017 WL 457184, at *5 ("[B]ecause VFC refuses to participate in the litigation, default judgment is the only effective sanction."); *Jimenez*, 2010 WL 1303449, at *7 ("Under the circumstances, it would appear that alternative sanctions against Cunningham are not likely to be effective.  Moreover, Cunningham's failure to explain his conduct deprives us of the ability to craft a more moderate sanction that will ensure future compliance.  Having disregarded an order from this Court, having failed to respond to Plaintiffs' discovery requests, and having failed to plead or otherwise respond to D & B's cross-claims, it is apparent that any alternative sanctions against Cunningham would be fruitless.").

Accordingly, the fifth factor weighs in favor of entry of default judgment against Mr. Nadav and Official Unlimited.

### 6.  <u>The Meritoriousness of Claims or Defense</u>

Finally, we consider the meritoriousness of the claims and defenses in this case.  Viewing the allegations of the Amended Complaint as true, Plaintiff has stated meritorious claims against

Mr. Nadav (for breach of the Personal Guaranty) and Official Unlimited (for breach of the Account Agreement).  *See Williams-Lester*, 2017 WL 457184, at *5 ("[S]ixth, based on the facial validity of the pleadings, Williams-Lester sufficiently alleged four meritorious claims for violation of the FDCPA.  In sum, every factor supports the entry of default judgment."); *Plumbers Union Local No. 690*, 2009 WL 2591153, at *4 ("We have reviewed the Amended Complaint and are satisfied that Plaintiffs' claims are meritorious.  Since Scarpato and F.P.S. Plumbing have provided no argument to the contrary, this factor weighs in favor of entry of default judgment.").  Although Mr. Nadav and Official Unlimited responded to Plaintiff's original Complaint and included affirmative defenses therein (*see* Doc. Nos. 14, 19), they did not respond to Plaintiff's Amended Complaint.  *Cf. Malibu Media, LLC*, 2015 WL 779494, at *3 ("Though Defendant filed an answer to Plaintiff's second amended complaint, the answer provides little more than denials of Plaintiff's allegations and, therefore, does not provide a clear and dispositive defense to Plaintiff's claims . . . Because this Court is unable to fully weigh the merits, if any, of Defendant's defenses, this final factor slightly weighs in favor of the entry of default judgment or can be considered a neutral factor.").  Therefore, the sixth factor also weighs in favor of the entry of default.

* * *

Taken together, the Court finds that Mr. Nadav and Official Unlimited have abandoned their defense in this litigation, and our analysis of the *Poulis* factors lead us to conclude that a default judgment against both Defendants is appropriate.

### C. Damages

Having determined that Plaintiff is entitled to entry of default judgment, the Court now considers the appropriate amount of damages.  "The Court may calculate damages by receiving

evidence and detailed affidavits from the claimant in lieu of a hearing." *Williams-Lester*, 2017 WL 457184, at *5.  The Account Agreement and statement of account together show that Plaintiff is entitled to the price of the cost of the Nike products provided:  $758,701.98.  (*See* Doc. No. 1, Exs. A & C.)  Plaintiff represents that because it obtained a voluntary resolution with another potentially responsible party, it only seeks $703,701.98.  (*See* Doc. No. 71 at 8.)  The Court finds that Plaintiff is entitled to this amount.[9]

## V.    Conclusion

For the foregoing reasons, Plaintiff's motion is granted and judgment entered in favor of Plaintiff in the amount of $703,701.98.

An appropriate Order follows.

---

[9] The Account Agreement and Personal Guaranty also include other terms relevant to damages.  (*See, e.g.*, Doc. No. 1, Ex. A to Ex. A at 15 ("Any sum not paid when due is subject to a service charge of 1.5% per month or the maximum rate permitted by law, whichever is lower."); *id.* at 18 ("Customer will pay all costs, collection agency fees, expenses, reasonable attorney fees . . . incurred by NIKE in connection with the collection of any past due sums."); Doc. No. 1, Ex. B at 21 ("NIKE will be entitled to collect from Guarantor all of NIKE's costs, collection agency fees, expenses, attorney fees and fees of corporate counsel incurred in connection with the collection efforts (including, without limitation, at trial and on appeal.").)  However, because Plaintiff represents that it is not seeking attorneys' fees, interest, and costs (*see* Doc. No. 73 at 2; Hr'g Tr.) and appears to seek only the contract amount (*see* Doc. No. 71 at 1, 14), the Court does not consider those additional terms.